**CREWS v. TEXAS & P. RY. CO.**

No. 2111.

Court of Civil Appeals of Texas. Eastland.
Feb. 28, 1941.

Rehearing Denied March 28, 1941.

Thomas & Thomas, of Big Spring, and
B. F. Russell, of Baird, for appellant.

H. C. Shropshire, of Weatherford, for appellee.

GRISSOM, Justice.

A. D. Crews sued the Texas & Pacific Railway Company for damages alleged to have been sustained in a fall from defendant's engine while he was lubricating it in the nighttime in defendant's roundhouse yards at Baird. Plaintiff alleged he was an assistant hostler and that it was his duty when the engine, from which he fell, came into the yard to take a gallon can of hot oil, climb the side of the engine, with a flashlight in one hand and the oil in the other, and, clinging to the side of the engine, pour the oil into the lubricator. That the place at which he was required to climb the engine and lubricate it was dark; that defendant at its other roundhouses usually furnished a stool upon which the assistant hostler could stand, and that the defendant on this occasion should have furnished plaintiff a hostler's stool, or ladder, or similar device, to assist him in climbing to the point on the engine where he was to lubricate it and on which he could stand while he was performing his work. That defendant failed to furnish a hostler's stool, or similar device; that such failure was negligence and the proximate cause of plaintiff's injury.

Plaintiff alleged that prior to his injury he requested defendant to furnish a hostler's stool; that defendant promised to provide it; that plaintiff depended upon such promise and continued to work for defendant until May 17, 1939, when he was injured; that if defendant had refused to furnish such stool he would not have continued to do said work. "That in such awkward position plaintiff slipped off the guide yoke step, and, losing his hold, fell to the ground." There followed allegations of resulting injuries. Plaintiff alleged that defendant's failure "to furnish proper and safe support upon which to work while lubricating the engine" was negligence and the proximate cause of his injuries.

Defendant's answer, among other things, alleged contributory negligence; that plaintiff's negligence was the sole proximate cause of his injuries; that defendant was engaged in interstate commerce; that plaintiff's injuries were due to risks assumed by him; that he had full knowledge of all the matters and things alleged by him in his petition as constituting negligence; that such things were open and obvious, and well known to plaintiff, and plaintiff appreciated the danger arising therefrom; that plaintiff continued in the employment of the defendant with such knowledge and appreciation of danger, and, therefore, assumed all risks of injury arising therefrom.

At the close of the plaintiff's testimony, the court instructed the jury to return a verdict for defendant, which it did, and judgment was entered for defendant. Plaintiff has appealed.

Plaintiff says the court instructed the jury to return a verdict for the defendant upon the theory that the evidence showed as a matter of law that plaintiff assumed the risk.

It was agreed defendant was engaged in interstate commerce at the time of his injury.

Plaintiff's testimony was to the effect that he had worked for defendant "off and on" since 1923; that he had worked as assistant hostler for defendant at Big Spring and Baird. That his duties required him to fill the lubricators with valve oil and to supply the engine with fuel oil, water and sand in order to get them in shape to go out on the road; that the cans furnished by defendant to plaintiff to carry hot oil to the engine were one-gallon cans. That the place on the engine where the oil was put in was 7½ or 8 feet from the ground. To fill the lubricator with hot oil required climbing up and down the side of the engine three times. He was asked how high his feet were off the ground at the time he was attempting to pour oil in the engine. He answered: "My right foot was approximately 2 foot and a half or three foot from the ground." He said that the ground there was sloping and rocky. He described the method of ascending the engine for the purpose of lubricating it and the places upon which plaintiff was supposed to stand and climb as follows:

"There was a step. It is a piece of iron, called a step on the bottom of the guide, called the guide step. That's where my right foot was. And there is a guide yoke step, that's approximately foot and one-half or four foot higher than the guide step and that's where my left foot was when my foot slipped off of the guide step throwing me backwards.

"Q. About how far apart, not height, but about how far apart running from the front to the back of the engine is the lower-

step and the yoke step? A. About four feet.

"Q. In what position were your legs if you had to stand with both feet, one on one step and one on the other? A. They were just about as far as I could reach apart.

"Q. In a 'Y' shape? A. Yes sir.

"Q. Spraddled? A. Yes sir. Spraddled out.

"Q. Where were your hands when you were operating the job of pouring this oil into the engine? A. Had a gallon can in my left one and my arm was around the guide rod, guide rod, I believe that's what they call it. Anyhow it is a rod. It is put up there to—a valve rod is what it is and I had a flash light in my right hand and my arm was around that rod, holding me up there.

\* \* \* \* \* \*

"Q. Now just describe to the jury briefly, you might have already partly done so, the position in which you were when you fell? A. I was standing up on the guide yoke step, guide step with my right foot and guide—my left foot on the guide yoke step and my arm around the valve rod and a flash light in my right hand and a gallon can of valve oil in my left hand and my foot slipped off of the guide step; that's the lower step, throwing me backwards on the ballast out there by the side of the track."

Plaintiff testified that the hand holds and steps on the side of the engine put there for use in filling the lubricator are open and obvious "in day light"; "you can't use them hand holds and pour oil with this hand; \* \* \* you can't find them in the dark."

"Q. You could take your flash light and find them couldn't you? A. And hold up there?

"Q. Yes sir. A. How you going to hold with your other hand; you can't do it.

"Q. All right. You could take your flash light and with your knowledge of the presence of them there locate any of them couldn't you? A. No, sir.

"Q. You couldn't? A. No, sir."

That the steps on the side of the engine were "Black, oil covered steps."

With reference to a request for a hostler's stool, defendant's promise and plaintiff's reliance thereon, he testified, substantially, as follows: That he requested Mr. J. E. Friend, defendant's master mechanic at Big Spring, who had supervision and charge and gave orders at Baird relative to such matters, to furnish him a hostler's stool for the purpose of lubricating engines. That the request was made about a month prior to plaintiff's injury; that Mr. Friend said "Go tell Mr. Fetterly, the roundhouse foreman, to make you a stool to stand on to fill those lubricators." That Mr. Fetterly was the roundhouse foreman at Baird, where plaintiff was employed. That plaintiff delivered the message to Mr. Fetterly; that Mr. Fetterly said "We will make no changes. We will do it just like we have been doing it. Climb up there and fill them." Plaintiff said he again spoke to Mr. Friend and that Mr. Friend said "I will go down there and see about it myself." That this conversation occurred approximately thirty days prior to plaintiff's injury. Plaintiff testified that he continued to work because he was expecting a stool to stand on "everyday" to be built to fill that lubricator, or to use in his work supplying engines. That plaintiff didn't make one himself because he didn't have the authority and would not have been permitted to use it if he had. That during said thirty-day period if plaintiff had known he was not going to get a stool he would not have continued to work because "it was dangerous. I was afraid I would get killed." That plaintiff had worked at said position prior to his fall, without a stool, "about four months, the last time"; that he had worked before that without a stool at Baird; that he had never worked at any other place than Baird without such a stool; that plaintiff had been an assistant hostler off and on ever since he had "hired out"; that all of the time he had worked in such position except at Baird, he had been furnished a three-legged hostler's stool for said purpose, but had never been furnished one at Baird. That when he was engaged, other than as assistant hostler, he saw what the hostlers and their helpers were doing, at Baird; that they were doing such work in the same way as plaintiff did. That when he worked for defendant at Big Spring he was furnished a hostler's stool for the purpose of filling the lubricators on the engines. That he held such a job at Big Spring about a year or year and a half "steady"; that the ground from which the hostler stepped on to the engine for the purpose of lubricating it was smoother at Big Spring than

Baird. He described the manner in which he could have used a three-legged stool on the ground at Baird as follows: "The fill, under these engines doesn't come out past the guide over two, three or four inches and the rest of the rocks scattered and if you had this stool about three and one half feet high, which they make them, and I will say about eighteen inches in diameter at the top, you could set one leg there next to the rock ballast the other two hit the side and you could step up on it and fill your lubricator with the engine—."

Plaintiff testified he was not furnished a ladder or any other device, other than those attached to the engine, for the purposes of assisting him in climbing the engine and servicing it. Plaintiff testified he knew it was "very dangerous to do that work" and with such knowledge after being promised the stool he continued to do that work in the same way for about a month after he was promised a stool.

With reference to whether or not the evidence showed conclusively that plaintiff assumed the risk incident to doing his work, under the conditions alleged and indicated by the evidence, we call attention to the following authorities:

In Texas & N. O. R. Co. v. Bingle, 91 Tex. 287, 288, 42 S.W. 971, Chief Justice Gaines said: "The servant, by entering the employment of the master, assumes all the ordinary risks incident to the business, but not those arising from the master's neglect. It is the duty of the master to exercise ordinary care to furnish him a safe place in which to work, safe machinery and appliances, to select careful and skillful co-workers, and, in case of a dangerous and complicated business, to make such reasonable rules for its conduct as may be proper to protect the servants employed therein. The servant has the right to rely upon the assumption that the master has done his duty; but if he becomes apprised that he has not, and learns that the machinery is defective, the place unnecessarily dangerous, or that proper rules are not enforced, he assumes the risk incident to that condition of affairs, unless he informs the master, and the latter promises to correct the evil. In this latter event, *so long as he has reasonable grounds to expect, and does expect, that the master will fulfill his promise, he does not, by continuing in the employment, assume the additional risk arising from the master's neglect.*" (Italics ours.)

In Hilje v. Hettich, 95 Tex. 321, 325, 67 S.W. 90, 91, Associate Justice Williams said: "Another objection made to the charge is that it involves the proposition that, if a promise had been made to supply more light, all question of assumption of risk by the servant was removed from the case, although it should appear, from lapse of time or otherwise, that before he received his injury plaintiff should have known that the promise would not be fulfilled. The idea of the charge seems to be that after a promise, on the part of the master, to remedy a defect, has been made, there can be no assumption of risk by the servant, but only contributory negligence would defeat his action for injuries sustained from the defective and dangerous condition which the master had promised to remove. We do not think this is true. The authorities which treat of the effect of such a promise to repair generally limit its operation, as preventing the conclusion that the servant has assumed the risk, to a reasonable time for the master to comply; and lay it down that, when it is or should be manifest to the servant that the defect will not be remedied, a further continuance in the service will be an assumption of the risk. [Texas & N. O.] Railway Co. v. Bingle, 91 Tex. 287, 42 S.W. 971. This is only an application of the general principle that a servant who knows of a dangerous condition, brought about by the negligence of the master, assumes the risk of it if he continues in the employment. When he knows, or ought to know, that a promise to repair will not be performed, and yet remains in the service, he can not be longer regarded as acting upon the promise. The failure to fulfill the promise is negligence of the master, and the servant, knowing definitely that any purpose to perform it has been abandoned by the master, does not thereafter rely on it. The testimony of plaintiff was that he made his complaint to the foreman, and received his promise three days before he was injured, and that the next evening he again mentioned the matter, and the foreman told him he would fix the lights the next morning. The testimony on this point is a little obscure, and leaves the impression that the witness may have meant that the last conversation was in the evening before he was hurt at night; but the jury could have found that it was on the day previous, and that the lights were not improved the next morning, as promised. The seed room was lighted by electricity,

and all that was necessary, according to plaintiff's evidence, was to put globes in some of the sockets which were empty, and remove the dust from such as were in place, which could have been done in a very short time. It cannot be said that these facts showed conclusively that there was no purpose to carry out the promise with respect to the lights; nor can it, we think, be said that the jury should have been virtually instructed that the promise removed all question of assumption of risk by the servant. The evidence was sufficient to make it proper for the court to submit to the jury the view of the law which we have just stated."

In Taylor v. White, Tex.Com.App., 212 S.W. 656, 658, the court said: "A servant is not relieved of the assumption of the risks of a known defect by reason of a promise to remedy or repair unless it appears that his continuance in the service was in reliance on such promise. The authorities on this subject generally limit the operation of the promise, as preventing the conclusion that the servant has assumed the risk, to a reasonable time for the master to comply, and, when it is or should be manifest to the servant that the defect will not be remedied, a further continuance in the service will be an assumption of the risk. Hilje v. Hettich, 95 Tex. 321, 67 S. W. 90. Plaintiff testified that he first requested defendant's superintendent to provide a guard rail about eight months before he was injured, and received his promise that he would attend to it 'right away'; that he renewed the request about four months later, the superintendent saying he would fix it as soon as he could get to it; that he mentioned the matter the last time about six weeks or two months before he was injured, and the superintendent replied, 'I will fix it as soon as I can get to it, right away.' Plaintiff did not testify that he remained in the service relying on the promise to provide a guard rail, and we think it clearly appears from his testimony that he did not. He must have known, from the many promises made and broken covering a period of eight months, that defendant had no intention of remedying the alleged defect. To be relieved of the assumption of the risks of a known defect by reason of a promise to remedy, the servant must have reasonable grounds to expect that the promise will be fulfilled. [Texas & N. O.] Railway [Co.] v. Bingle, 91 Tex. 287, 42 S.W. 971."

Also, see Taylor v. White, Tex.Civ.App., 156 S.W. 349, 353.

In Detroit Crude-Oil Co. v. Grable, 6 Cir., 94 F. 73, 78, the United States Circuit Court of Appeals announced the rule with reference to the period of time within which a servant might continue to rely upon an unfulfilled promise of his master to remedy a defect, as follows: "An exception to the rule of exemption or immunity of the master from liability under such circumstances arises when the master expressly or impliedly promises or assures the servant that the defect shall be remedied, or the danger removed. During the running of such a promise, the servant may rely upon the master's promise or assurance, and recover in case of an accident resulting from the defect, although obvious, if the claim to damage is otherwise good. This liability of the master in consequence of a promise or assurance continues only for such period of time as might reasonably be allowed or required to remedy the defect or for removal of the danger. 'After the prescribed period has elapsed without change, or if the master has refused to remedy the defect, the servant cannot rely upon his expectation of a remedy as an excuse for remaining, whatever rights he may have upon other grounds; and in many cases it has been held that he "assumed the risk." ' "

Also, see McPeck v. Central, etc., R. Co., 1 Cir., 79 F. 590, 593.

In Missouri, K. & T. R. Co. v. Baker, 35 Tex.Civ.App. 542, 81 S.W. 67, 68, writ refused, the rule with reference to time was announced as follows: "In all such cases the master has a reasonable time within which to comply with such promise, and until it is or should be manifest to the servant that the promise to repair would not be complied with, and that the defect would not be remedied, a further continuance by him in the master's service will not impose upon him the assumption of the risk occasioned by such defect. The question as to what would be a reasonable time, under the particular facts of this case, was a question of fact for the jury to determine."

To the same effect is the holding in Southwestern States Portland Cement Co. v. Young, Tex.Civ.App., 140 S.W. 378, 381, writ refused. Also, see International & G. N. R. Co. v. Williams, 82 Tex. 342, 344, 18 S.W. 700.

1084

In Galveston, H. & H. R. Co. v. Hodnett, 106 Tex. 190, 194, 163 S.W. 13, 15, the rule announced in the Bingle case, supra, was interpreted by Justice Phillips, as follows: " * * * where the servant has informed the master of the defect or unsafe condition, and has received his promise to correct the condition. In such event, *so long as he has reasonable grounds to expect and does expect that the promise will be fulfilled, he does not, by continuing in the service in reliance upon the promise, assume the risk.*" (Italics ours.) With reference to the opinion in the Bingle case, he said: "The opinion makes it plain that the risk is not assumed by continuance in the service in reliance upon the master's promise for such a time as the servant has reasonable grounds to believe and does believe it will be fulfilled, and a finding to such effect would dispose of that issue."

"Where the master or his representative promises to remedy the defect, the servant by continuing in his employment for a reasonable time after such promise does not assume the risk of injury from the defect unless the danger was so patent that no person of ordinary prudence would have continued to work * * *." 39 C.J. p. 786, § 986.

"Where the danger is so obvious and imminent that no prudent person would undertake to perform the service, the servant is not justified in continuing in the performance of his services and assumes the risk of any injury which he may sustain." 39 C.J. p. 790, § 989.

"Where no definite time is fixed for making repairs, if the servant remains in the service longer than a reasonable time after the master's promise to repair the defect, he will be held to have assumed the risk. In some cases it is held that what is a reasonable time is to be determined by the time which might reasonably be required by the master in which to make the repairs; while in others it is held that the servant is entitled to remain for any period which will not preclude the reasonable expectation that the promise will be kept. Cases illustrative of what is, or is not, a reasonable time are set out in the notes hereto." 39 C.J. p. 793, § 995.

See, also, 39 C.J. p. 794, Notes; Hough v. Texas & P. R. Co., 100 U.S. 213, 225, 25 L.Ed. 612; Illinois Steel Co. v. Mann, 170 Ill. 200, 48 N.E. 417, 40 L.R.A. 781, 62 Am. St.Rep. 370; Plowman Construction Co. v. Garrison's Adm'r, 157 Ky. 462, 163 S.W.

486; Stonega Coke & Coal Co. v. Busch 176 Ky. 690, 197 S.W. 389; A. L. Clark Lumber Co. v. Hurst, 124 Ark. 599, 186 S. W. 619; Consolidation Coal Co. v. Hamilton, 170 Ky. 393, 186 S.W. 197; Graves v. Metropolitan Street Ry. Co., 175 Mo.App. 337, 162 S.W. 298; Jones v. Walker County Lumber Co., Tex.Civ.App., 162 S.W. 420; American Tobacco Co. v. Adams, 137 Ky. 414, 125 S.W. 1067; Cheek v. Eyth, 149 Kan. 586, 89 P.2d 11, 13; Reader R. R. v. Sanders, 192 Ark. 28, 90 S.W.2d 762, 764; Odell v. St. Louis-San Francisco R. Co., Mo.App., 281 S.W. 456; Bevin v. Oregon, etc., Co., 136 Or. 18, 298 P. 204, 208; Baker v. Augusta Veneer Co., 44 Ga.App. 383, 161 S.E. 676; Braden v. Friederichsen, etc., Tile Co., 223 Mo.App. 700, 15 S. W.2d 923, 927; Southern Pac. Co. v. Lasch, 2 Tex.Civ.App. 68, 21 S.W. 563; Hudgins v. Kansas City, M. & O. R. Co., Tex.Civ.App., 2 S.W.2d 958, 10 L.R.A.,N. S., 1044, Notes; 40 L.R.A. 790, Notes; 87 AmSt.Rep. 581, Notes; 119 Am.St.Rep. 440, Notes; Toledo, St. L. & W. R. Co. v. Allen, 276 U.S. 165, 48 S.Ct. 215, 72 L.Ed. 513; Kansas City Southern R. Co. v. Williford, 5 Cir., 65 F.2d 223; Keys v. Pennsylvania R. Co., 2 Cir., 104 F.2d 663; Butler v. Frazee, 211 U.S. 459, 29 S.Ct. 136, 53 L. Ed. 281; Hamilton v. St. Louis, S. F. & T. R. Co., 115 Tex. 455, 283 S.W. 475; Missouri Pac. R. Co. v. David, 284 U.S. 460, 52 S.Ct. 242, 76 L.Ed. 399; Boldt v. Pennsylvania R. Co., 245 U.S. 441, 38 S.Ct. 139, 62 L.Ed. 385; Gulf, C. & S. F. R. Co. v. Garren, 96 Tex. 605, 614, 74 S.W. 897, 97 Am.St.Rep. 939.

In Seaboard, etc., Ry. v. Horton, 239 U. S. 595, 36 S.Ct. 180, 60 L.Ed. 458, the court held, where complaint of the defect had been made by the servant, the master had promised to remedy the defect, and the servant, relying upon the promise, continued in the service, there was an exception to the rule that the servant assumed the risks known and appreciated by him, unless the danger of remaining in the employment pending performance of the promise was so imminent and obvious as to import an assumption of the risk, notwithstanding the employer's promise to remedy the defect.

In Chicago, R. I. & G. R. Co. v. Frederick, Tex.Civ.App., 74 S.W.2d 275, writ refused, the Amarillo Court of Civil Appeals held, where a brakeman was injured while standing on the foot board of a locomotive tender in a collision with rocks on the railroad track, and where the brake-

man should and did know that possibly there were obstructions on the track, the servant was not shown, as a matter of law, to have assumed the risk incident to such action.

In Lawson v. Hutcherson, Tex.Civ.App., 138 S.W.2d 131, Lawson was employed by Hutcherson to operate a tractor, The day Lawson began driving the tractor he learned it was defective. He informed his employer there was something wrong with the steering gear and he was having trouble with it. At least twice thereafter he again informed his employer that there was something wrong with the tractor and pointed out some of the defects. The employer advised Lawson that in a short time he would have another tractor ready for appellant to use, to continue the use of the one he was driving; that the tractor he was driving would be fixed when it rained, or at some convenient time when the employer was not too busy. On such assurances, appellant continued to operate the tractor. Lawson had driven a tractor in the summertime for five or six years. The first complaint was made June 19th. The tractor was not repaired and the employee was injured as a result on June 30th. The court instructed the jury to return a verdict for the defendant. The instructed verdict was apparently based upon the conclusion that the evidence showed, as a matter of law, that Lawson had assumed the risk incident to his continued operation of the defective tractor. The appellate court held to the contrary and reversed the judgment. It quoted in its opinion from Coca-Cola Bottling Co. v. Dickson, Tex.Civ.App., 115 S.W.2d 1223, 1224, as follows: "It has been frequently held to be reversible error for the court to direct a verdict, ' "If, discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff." ' "

■ From the foregoing authorities we think it is clear that an exception to the general rule (that a servant, with knowledge and appreciation of the danger in using defective machinery furnished by the master, who continues in the employment assumes the risk) is generally recognized when the servant complains of the defect, the master promises to correct it, and the servant continues to work with the defective machinery, or instrument, relying upon the promise of reparation, provided (1) the danger is not so imminent and obvious that a reasonably prudent person would not continue to work, regardless of the promise, and (2) the servant does not continue to work after he can no longer reasonably expect, or does not expect, the master to keep his promise.

■ After a careful consideration of the testimony, and, giving credit to all the testimony favorable to plaintiff, and indulging every legitimate inference which might be drawn from the facts in evidence, we conclude a jury might have found for the plaintiff on the issue of assumed risk. In other words, the evidence does not show, as a matter of law, that plaintiff assumed the risk incident to continuing his work as assistant hostler without the aid of a hostler's stool. Wichita Falls & S. R. Co. v. Lindley, Tex.Civ.App., 143 S.W.2d 428, 432; Jackson v. Langford, Tex.Civ. App., 60 S.W.2d 265, 267. If the instructed verdict depends alone upon the conclusion that assumption of risk by the plaintiff was shown conclusively, it cannot be sustained. We are of the opinion it is not conclusively shown that the danger was so imminent and obvious as to deprive plaintiff of the right to continue in defendant's employment relying upon its promise. Seaboard, etc., Ry. v. Horton, supra.

■ Whether the instructed verdict was based upon the conclusion that assumption of the risk by plaintiff was conclusively shown or not, it is our duty to affirm the judgment, based on the instructed verdict, if any issue essential to plaintiff's recovery, or any absolute defense, is conclusively established against the plaintiff. After a careful study of the evidence, we conclude that no such issue is established as a matter of law, but, we think that "discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff." Gross v. Shell Pipe Line Corp., Tex.Civ.App., 48 S.W.2d 377, 378.

We, therefore, conclude the court erred in directing a verdict for the defendant. The judgment is reversed and the cause remanded.